## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **JEANNIE R. MOSIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:07-CV-118** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Jeannie R. Mosier appeals to the District Court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Mosier applied for DIB on April 10, 2002, alleging that she became disabled as of February 1, 2001.  (Tr. 63-65.)  The Commissioner denied her application initially and upon reconsideration.  (Tr. 41-43, 50-53.)  On October 6, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Mosier, who was represented by counsel, Mosier's husband, and a vocational expert ("VE") testified.  (Tr. 448-96.)  On May 2, 2005, the ALJ rendered an unfavorable decision to Mosier.  (Tr. 15-24.)  Mosier submitted a timely request for review to the Appeals Council, which was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6, 13.)

Mosier filed a complaint with this Court on May 21, 2007, seeking relief from the

---

[1] All parties have consented to the Magistrate Judge.  *See* 28 U.S.C. § 636(c).

Commissioner's final decision.  (Docket # 1.)  She argues that the ALJ improperly evaluated the opinion of her treating physician, Dr. Shareghi, as well as the credibility of her symptom testimony.  (Opening Br. in Soc. Sec. Appeal ("Opening Br.") 18, 20.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Mosier was fifty years old at the time of the ALJ's decision.  (Tr. 63.)  She had a high school education and past work experience as a billing clerk, home health aide, clerical worker, business office representative, customer service representative, and school custodian.  (Tr. 68, 73, 123.)  She alleged intractable migraine headaches, fibromyalgia, anxiety attacks, and post traumatic stress disorder (PTSD) in her Disability Report (Tr. 67), and then also included in her Opening Brief reflex sympathetic dystrophy (RSD),[3] psychological factors affecting chronic pain, depression, panic attacks, obsessive compulsive disorder, personality disorder (self defeating), somatoform disorder, restless leg syndrome, obesity, and gastroesophageal reflux disease (Opening Br. 2).

At her hearing, Mosier testified that her headaches vary depending on what triggers them (such as stress, sinus problems, and bright lights), some leading to facial and dental pain, others leading to pain "like somebody taking a big knife and shoving it into your eye."  (Tr. 465-66.)  She further stated that the headaches are severe but the intensity varies, and in the past she had

---

[2] The administrative record in this case is voluminous (496 pages), and the parties' disputes involve only small portions of it, that is, the ALJ's evaluation of the opinion of Mosier's treating physician, and his finding that Mosier's symptom testimony was not fully credible.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] RSD, also known as complex regional pain syndrome type I, is defined as "diffuse persistent pain usually in an extremity often associated with vasomotor disturbances, trophic changes, and limitation or immobility of joints; frequently follows some local injury."  STEDMAN'S MEDICAL DICTIONARY 1895 (28th ed. 2006).

been able to go her job with headaches that had not yet developed into migraines. (Tr. 467.) Mosier testified that the migraines are so severe that she cannot see, concentrate, or think (Tr. 467), and that she has pain throughout her body (Tr. 470-72). For example, she stated that her left arm hurts so bad she "can't hardly lift it to hold the car wheel or do anything[,]" and that "[t]here are spots on [her] body where the skin's way more sensitive than everywhere else and . . . sometimes those change." (Tr. 470.) She elaborated, "[I]f you touch me it hurts badly and stays hurting." (Tr. 471.) She classified her pain as a ten out of ten on a subjective pain scale, with ten being so severe that she would have to go to the hospital. (Tr. 471-72.) Mosier also testified to the plethora of medications she takes for her various problems, explaining that they can make her feel "not clear." (Tr. 473-76.) Because of her pain, her husband helps out with taking care of their daughter. (Tr. 494.)

Despite this pain, Mosier's daily activities include waking up at seven o'clock in the morning to ensure that her daughter is dressed, to do her daughter's hair, and to fix breakfast for her, sometimes muffins or scrambled eggs. (Tr. 99, 479-80.) She gets her daughter off to school, either by bus or by driving her. (Tr. 99, 480.) Between significant periods of rest throughout the day, Mosier also does housework, such as washing dishes, cleaning the litter box, or making simple meals. (Tr. 99, 480-83.) She also does laundry at the laundromat with help. (Tr. 99.) She watches television, but frequently has to alternate between sitting and standing. (Tr. 481.)

3

*B. Summary of Relevant Medical Evidence*

Mosier has a long history of migraine headaches.  From 1999 through 2002, she sought

frequent and numerous treatments (including injections) from her family physician, Dr. Lisa

Booth (*see, e.g.,* Tr. 272, 287-88, 290, 292, 294, 296, 301, 303, 304, 306, 308, 310), and at the

emergency room ("ER") (*see, e.g.,* Tr. 134-180).  In 2001, Dr. Booth referred her to the

Michigan Head-Pain and Neurological Institute ("Michigan Head-Pain") for evaluation.  (Tr.

287.)

On February 21, 2001, Mosier saw Dr. Alicia R. Prestegaard, a neurologist at Michigan

Head-Pain.  (Tr. 206-08.)  Mosier reported that her headaches have increased in intensity over

time and have been daily since approximately 1992.  (Tr. 206.)  Mosier explained that her

headaches are usually moderately intense, a three out of five on the subjective pain scale, and

that as many as three days per week the headache escalates to a five out of five.  (Tr. 206.)  Dr.

Prestegaard found evidence of trigger points in bilateral trapezius and tenderness in the left OCJ,

upper back, and shoulders, but not the typical tender points of fibromyalgia.  (Tr. 208.)

Dr. Prestegaard's assessment was intractable migraine variant headaches; analgesic-

related rebound due to frequent use of Demerol for acute care; myofascial regional pain

syndrome involving upper back and shoulders; possible left TMJ disturbance; depression,

anxiety, and panic; sleep disturbance and possible post-trauma syndrome; restless leg syndrome;

and perimenopause on hormone replacement therapy.  (Tr. 208.)  Dr. Prestegaard recommended

a new prophylactic program with a combination of medications.  (Tr. 208.)  She adjusted

Mosier's prescriptions, advised her to avoid Demerol treatments, and referred her to physical

therapy and psychology for pain management and to address her depression and potential PTSD.

4

(Tr. 208.)

On April 10, 2001, Mosier visited Kim Bialik, Ph.D., a psychologist at Michigan Head-Pain. (Tr. 202-04.) Mosier reported that her headaches had improved significantly since her prior visit, she had fewer ER visits, and she avoided excessive amounts of narcotics, but that she was still incapacitated. (Tr. 202.) Mosier acknowledged symptoms of PTSD. (Tr. 202.) She also elaborated on her depression and stated that it improved since she began using Paxil; the doctor noted an improvement in her Beck Depression Inventory score of 22 from 36 the month before. (Tr. 203.)

Dr. Bialik's impressions were PTSD, chronic, with delayed onset; depressive disorder, NOS; and migraine variant, ruling out other diagnoses. (Tr. 203.) Dr. Bialik advised Mosier about a variety of methods she should pursue for pain management and relaxation. (Tr. 204.)

Mosier also saw a physical therapist on April 10 at Michigan Head-Pain. (Tr. 199-201.) The physical exam indicated significant tenderness on palpation of the upper arms, pectoralis musculature, upper trapezius, suboccipital and sternocleidomastoid musculature, but not on the typical fibromyalgia tender points. (Tr. 199.) The physical therapist referred Mosier to one in her local region for treatment on muscle imbalances and postural/somatic dysfunction. (Tr. 201.)

On April 27, 2001, Mosier went to the ER for a migraine, and the ER physician refused to give her opiates, describing her as "a frequent flyer." (Tr. 198.)

On June 18, 2001, Mosier returned to Dr. Bialik to discuss disability issues. (Tr. 197.) Mosier acknowledged that she had not followed up on Dr. Bialik's recommendations to seek more intensive psychotherapy with a local psychologist. (Tr. 197.) Dr. Bialik said she could not yet consider Mosier for disability because she had not followed through with these

recommendations, and suggested that she look into temporary employment agencies.  (Tr. 197.)

The next day, June 19, Mosier saw Dr. Fong Wang, a neurologist, at Michigan Head-Pain.  (Tr. 194.)  He reported that Mosier completed a course of physical therapy, was sleeping better, had improved since using Depakote, and that she experiences severe headaches once to twice per week for up to twelve hours.  (Tr. 194.)  Dr. Wang adjusted her medications.  (Tr. 194.)

On August 29, 2001, Mosier saw Danette Taylor, D.O., at Michigan Head-Pain and was given acute therapy for a severe headache.  (Tr. 188.)  Mosier indicated slight improvement in her headaches since the month before, with her mild to moderate headaches persisting once or twice a week, as well as her severe headaches.  (Tr. 188.)  Dr. Taylor noted significant side effects and adjusted her medications.  (Tr. 188.)

On October 24, 2001, Mosier saw Alvin E. Lake, another psychologist at Michigan Head-Pain.  (Tr. 186-87.)  Mosier could not answer clearly as to whether her headaches were better because they were "unpredictable, changing constantly."  (Tr. 186.)  She indicated that recently she had a week of severe headaches that prompted a trip to the ER.  (Tr. 186.)  Dr. Lake noted Mosier was taking abortive medicines at least three days per week but did not appear to be in rebound.  (Tr. 186.)  Mosier also related doing "crazy things" in her sleep, acting out disturbing dreams, but that her mood was "much more manageable than at her initial visit."  (Tr. 186, 187.)  Dr. Lake emphasized that she attend therapy locally to deal with her issues.  (Tr. 187.)

On January 14, 2002, Mosier went to the Northeastern Center for a clinical consultation.  (Tr. 425.)  She was diagnosed with somatoform disorder, panic disorder, agoraphobia, migraines,

and other problems, but apparently did not return for a follow-up.  (Tr. 426.)

On April 11, 2002, Mosier visited Dr. Prestegaard for a reevaluation of her intractable headaches.  (Tr. 181.)  Mosier reported that her pain had worsened, with mild headaches now occurring three to five days per week and severe headaches two to three times per week, one of which recently caused her to visit the ER.  (Tr. 181.)  Dr. Prestegaard found that Mosier was experiencing a "a flare-up of her fibromyalgia with severe body pain[,]" that she had typical findings with tender points of fibromyalgia, and that her history was consistent with the syndrome.  (Tr. 181.)  Her assessment was migraine variant headaches (worse), exacerbation of fibromyalgia syndrome, psychological factors affecting chronic pain condition, and sleep disturbance.  (Tr. 181.)  She adjusted her medications and emphasized that Mosier attend physical therapy to treat the fibromyalgia.  (Tr. 181-82.)  Dr. Prestegaard also gave Mosier a new tentative date for admission into the Head Pain Treatment Unit at Chelsea Community Hospital, explaining that she had canceled a previously scheduled date in March because at that time her headaches and pain were under good control.  (Tr. 181.)

Dr. Prestegaard also noted that Mosier "got somewhat upset" with her because Mosier wanted Dr. Prestegaard to support her disability, but instead Dr. Prestegaard talked about gaining control over the pain, undergoing physical therapy, and going to the hospital.  (Tr. 182.)  The doctor stated, "I think my job as a physician is really trying to get her better first.  I believe she has pain, and she may not be able to work.  On the other hand, she should not give up on trying to get better."  (Tr. 182.)  This would be Mosier's final visit to Michigan Head-Pain.

On April 22, 2002, Mosier began seeing Dr. Gholamreza Shareghi at the Milestone Pain and Rehabilitation Center at the Community Health Center of Branch County.  (Tr. 330.)  They

discussed her history of migraines, and Mosier reported that she was experiencing one or two severe ones per week and a baseline headache daily. (Tr. 330.) Dr. Shareghi concluded that she had intractable chronic daily headaches and chronic migraines and determined that her fibromyalgia was "[a]nother major problem[.]" (Tr. 330-31.) Mosier reported that during the past two to four years her skin and muscles hurt everywhere, with the most pain in the right lower extremity and the left upper extremity. (Tr. 331.)

During the physical exam, Dr. Shareghi noticed that Mosier had a migraine. (Tr. 332.) He found that she had all the fibromyalgia points in the upper extremities, thighs, lower back, arms, and calves. (Tr. 332.) He further noted that light touch on both sides of the face up to the neck was normal bilaterally, but that she had allodynia[4] and hyperpathia[5] of the bilateral upper extremities and bilateral lower extremities, non-dermatomal and global. (Tr. 332.)

Dr. Shareghi's assessment was that Mosier had severe intractable and unrelenting migraines, global complex regional pain syndrome with right lower extremity and left upper extremity predominating, severe fibromyalgia, night terrors, depression, and chronic pain syndrome. (Tr. 334.) He wrote, "I believe that the severity and the global nature of the fibromyalgia despite the best effort of this patient and the best wishes of Dr. Prestegaard will not get better by physical therapy and exercise." (Tr. 334.) He added that Mosier "is beyond that and may benefit, because of the global nature of her illness, including the complex regional pain syndrome and the fibromyalgia, from intrathecal drug delivery system . . . ." (Tr. 334-35.) He

---

[4]Allodynia is a "[c]ondition in which ordinarily nonpainful stimuli elicit pain." STEDMAN'S MEDICAL DICTIONARY 52 (28th ed. 2006).

[5]Hyperpathia is an "[e]xcessive sensitivity and a raised threshold to painful stimuli." STEDMAN'S MEDICAL DICTIONARY 924 (28th ed. 2006).

8

believed the migraines would nevertheless remain even with the intrathecal drug delivery system. (Tr. 335.) Dr. Shareghi prescribed OxyContin along with Mosier's other medications. (Tr. 335.)

Mosier returned to Dr. Shareghi on April 29, 2002, and he reported that her headaches were thirty to fifty percent improved, she did not "have the ups and downs anymore[,]" and her fibromyalgia pain was fifty to sixty percent better. (Tr. 328.) He decided to conservatively increase her narcotics dosage. (Tr. 328.) He also noted that Mosier had an appointment to see a plastic surgeon about breast reduction surgery, which might reduce her pain. (Tr. 238.)

Mosier presented at the Community Health Center ER on May 6, 2002, for a severe migraine. (Tr. 325.) She underwent a CT scan, which had negative results. (Tr. 326.)

Mosier next saw Dr. Shareghi on June 5, 2002, asking if she could eliminate some medications from her regimen, but the doctor declined. (Tr. 322.) Mosier stated that she took short-acting pain medicine between Oxycontin doses because it did not last, and Dr. Shareghi increased her Oxycontin dose and put her on a Lidoderm patch. (Tr. 322.) He commented, "We are going to help fill out her disability papers. She should be a disabled individual." (Tr. 322.)

On July 8, 2002, Dr. Phillip S. Budzenski examined Mosier at the request of the state agency. (Tr. 228-33.) They discussed her medical history, including her headaches, chronic pain, and anxiety. (Tr. 228-29.) He found no paravertebral muscle spasm or tenderness of the spinous processes, but there was soft tissue tenderness, marked in severity, associated with some focal swelling in the left trapezius muscle. (Tr. 231.) Mosier had a normal range of motion (Tr. 231), and was able to squat, walk on toes and heels, and tandem walk (Tr. 232). She could make a fist, pick up coins, and button clothes with both hands. (Tr. 231.) She was also able to write

and had normal grip strength.  (Tr. 231.)  Her skin examination revealed some hypersensitivity throughout, but no evidence suggestive of RSD.  (Tr. 232.)

Dr. Budzenski's impression was polypharmacy, obesity by body mass criteria, left trapezius muscle swelling and tenderness, apparent narcotic dependence, chronic pain syndrome, hyperlipidemia on treatment, and irritable bowel symptoms.  (Tr. 232.)  He expressed concern that Mosier's various medications could be causing side effects or adversely reacting to each other.  (Tr. 232.)  He further noted that "she certainly would be unlikely to keep up with any type of fast paced work environment," and limited her lifting ability to five pounds continuously and ten pounds frequently.  (Tr. 233.)  He stated that she had full use of her right upper extremity in terms of grasping , pushing, pulling, or manipulating, but that she could not push or pull with her left upper extremity.  (Tr. 233.)  He also indicated that she has full use of her lower extremities for operating foot controls and should be able to work around machinery, but should not operate automotive equipment.  (Tr. 233.)  He further assessed that she could bend and squat continuously, but not crawl, climb, or work around unprotected heights.  (Tr. 233.)

Mosier met with Dr. Shareghi on July 23, 2002.  (Tr. 320.)  Mosier stated that the feel of her clothes suffocated her, and Dr. Shareghi decided to switch her from Prozac to Paxil.  (Tr. 320.)  Mosier also related that the OxyContin was helping but did not last eight hours, and the doctor added another prescription, OxyIR.  (Tr. 320.)

On July 29, 2002, Dr. A. Lopez, a state agency physician, completed a Physical Residual Functional Capacity Assessment and opined that Mosier could lift up to fifty pounds occasionally and up to twenty-five pounds frequently; stand or walk for about six hours in an eight hour work day; sit for about six hours in an eight hour workday; never climb ladders,

ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl;

and must avoid concentrated exposure to hazards such as machinery and heights.  (Tr. 235-23.)

On August 8, 2002, Dr. Patrick D. Utz conducted a mental status examination on Mosier

for the state agency.  (Tr. 245-48.)  Mosier related that she took so many medications she could

not discern which were helpful, nor could she tell the difference between new problems and side

effects.  (Tr. 247.)  Dr. Utz reported that she moved gingerly and spoke slowly, and he could not

tell whether she was exhausted or struggling with concentration, but believed her to be

exhausted.  (Tr. 246.)  He noted that "[h]er concentration is not as poor as she thinks it is, or

presents it, given her performance on serial 7's, etc.[,]" but that she "seem[s] to suffer from

chronic pain, and seems both physically and emotionally exhausted, which may seem to some to

be a major depression, but which to me seems to be a reaction to all the medications and the

physical distress associated with the chronic pain."  (Tr. 247.)  His diagnosis was adjustment

reaction with mixed emotional features including depression and anxiety, some signs of major

depression, some signs of histrionic and schizoid personality patterns, RSD, fibromyalgia,

migraine headaches, and restless arm and leg syndrome (by report).  (Tr. 248.)  He assigned her a

Global Assessment of Functioning (GAF) score of sixty.[6]  (Tr. 248.)

On August 13, 2002, Mosier visited Dr. Shareghi.  (Tr. 319.)  Mosier related that she had

been depressed and that her pain had worsened.  (Tr. 319.)  They discussed switching from

Prozac back to Paxil, and he also increased her Oxy IR prescription.  (Tr. 319.)

On August 25, 2002, Dr. F. Kladder, a state agency psychologist, reviewed the record

---

[6]The Global Assessment of Functioning Scale is used by physicians to report the individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32-34 (4th ed. Text Revision 2000) (hereinafter "DSM-IV-TR").  A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

and found that Mosier did not have a severe mental impairment.  (Tr. 249-63.)

On September 16, 2002, Mosier again saw Dr. Shareghi, and he reported that while the fibromyalgia was "exquisitely bad," the migraines responded reasonably well to the OxyContin and she had a good response to the change from Prozac to Paxil.  (Tr. 317.)

In a letter dated October 14, 2002, Dr, Shareghi wrote that he saw Mosier for a follow-up and that she suffers from three to four disabling conditions, noting that the most significant is the RSD and that it was overlooked on her social security disability application.  (Tr. 315.)  He commented that the RSD was "very disabling[,]" affecting half of her body.  (Tr. 315.)  He also wrote that her migraines had worsened, becoming unrelenting, and that her fibromyalgia was disabling and incurable.  (Tr. 315-16.)  Dr. Shareghi opined that Mosier was ninety percent permanently disabled, "without a shadow of a doubt."  (Tr. 316.)

On January 13, 2003, Dr. Shareghi evaluated Mosier and she reported that she was doing reasonably well with her migraines, but her energy was low and she was uncertain which of her many medications was the cause.  (Tr. 420.)  She also described pain in her left upper and lower extremities.  (Tr. 420.)  Dr. Shareghi maintained her prescriptions.  (Tr. 420.)  She returned on March 6, 2003, for a two-week long migraine headache.  (Tr. 419.)  Dr. Shareghi encouraged Mosier to apply for Social Security Disability and stated that she was permanently disabled.  (Tr. 419.)  He decided to schedule her for a continuous epidural narcotic trial.  (Tr. 419.)

Mosier next visited Dr. Shareghi on May 29, 2003.  (Tr. 313.)  He noted that they would pursue implantation of either a dorsal column stimulator or morphine pump if Mosier's condition did not improve.  (Tr. 313.)  He opined that he did not know how to prevent Mosier from becoming wheelchair bound within the next year.  (Tr. 313.)  Mosier saw Dr. Shareghi again on

June 30, 2003, reporting depression and problems with the RSD, migraines, and lack of energy. (Tr. 418.)  She returned on September 24, 2003, and Dr. Shareghi adjusted her medications and commented that a trial of an intraspinal narcotic was in order, but he wanted to see if her Medicare or other insurance provider would plan for it, as the cost the hospital quoted was "astronomical."  (Tr. 417.)  They met again on April 12, 2004, for a short follow-up because Mosier was to undergo hernia surgery.  (Tr. 416.)

On August 23, 2004, Dr. Shareghi completed a Medical Source Statement.  (Tr. 373-76.) His diagnosis was generalized RSD, intractable migraines, and severe fibromyalgia, and his prognosis was guarded and worsening.  (Tr. 373.)  Dr. Shareghi found that emotional or psychological factors did not contribute to Mosier's symptoms or limitations.  (Tr. 374.)  He determined that she would be unable to work an eight hour day, forty hours per week.  (Tr. 375.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[7]  *See* 20 C.F.R. §

---

[7] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.

*Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than

step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The

burden of proof lies with the claimant at every step except the fifth, where it shifts to the

Commissioner.  *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

The ALJ rendered his decision on May 2, 2005.  (Tr. 18-24.)  At step one of the

five step analysis, he found that Mosier had not engaged in any substantially gainful activity

since her alleged onset date.  (Tr. 19.)  At step two, he found that Mosier's alleged impairments

of migraine headaches, fibromyalgia, and RSD were severe, but her alleged anxiety and PTSD

were not.  (Tr. 19-20.)  At step three, the ALJ determined that Mosier's impairments did not

meet or equal a listing.  (Tr. 20.)  Before proceeding to step four, the ALJ found Mosier's

testimony about her symptoms "less than fully credible and not supported by the objective

medical evidence of record" and that she has the following RFC: "[T]he claimant retains the

residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently,

stand and/or walk for six hours in an eight-hour workday, and sit for six hours during a workday.

She cannot climb ladders, ropes or scaffolds."  (Tr. 22.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Mosier

could perform her past relevant work as a billing clerk, business office representative, customer

service representative, school custodian, and home health aide, and therefore she was not

disabled.  (Tr. 22-23.)  Alternatively, the ALJ determined at step five that even if Mosier could

not perform her past relevant work, a significant number of jobs exist within the national economy for someone with her RFC, including various clerk positions and small parts assembler positions. (Tr. 23.) Therefore, Mosier's claim for DIB was denied. (Tr. 23.)

### C. The ALJ Properly Evaluated the Opinion of Dr. Shareghi, Mosier's Treating Physician

Mosier first argues that ALJ improperly evaluated the opinion of Dr. Shareghi, her treating physician. (Opening Br. 18-20.) Specifically, Mosier asserts that "[a]lthough the ALJ very briefly summarizes the treatment notes of Dr. Shareghi . . . , the ALJ's brief and general reason for rejecting the opinion leaves the court unable to trace his reasoning." (Tr. 19.) Contrary to Mosier's assertion, however, the Court *is* able to trace the ALJ's reasoning, and finds that his evaluation of Dr. Shareghi's opinion was adequate.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

16

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner.  20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th

Cir. 1996).

Here, the ALJ discussed Dr. Shareghi's treatment relationship with Mosier.  He

acknowledged that Dr. Shareghi was a specialist in noting that he was of the Milestone Pain and

Rehabilitation Center.  (Tr. 21.)  *See* 20 C.F.R. § 404.1527(d)(5).  The ALJ then delved into Dr.

Shareghi's observations and findings, *see* 20 C.F.R. § 404.1527(d)(2)(ii), including that Mosier

had all the fibromyalgia trigger points and allodynia and hyperpathia of the bilateral and lower

extremities, and that two of her extremities felt colder than the others.  (Tr. 21.)  The ALJ further

noted that Mosier and Dr. Shareghi had "several" visits, *see* 20 C.F.R. § 404.1527(d)(2)(I), and

that Dr. Shareghi adjusted her medications and diagnosed her with RSD, severe fibromyalgia,

and migraines.  (Tr. 21.)  The ALJ also highlighted that Dr. Shareghi recommended that Mosier

receive a morphine pump but the treatment notes did not indicate that she ever received one.

(Tr. 21.)  The ALJ then noted, "Dr. Shareghi's treatment notes mention several times that the

claimant 'should be a disabled individual,' and is 'permanently disabled,' but he never

mentioned any specific limitations . . . ."  (Tr. 21.)  *See* 20 C.F.R. § 404.1527(d)(3).  The ALJ

also took into account Dr. Shareghi's Medical Source Statement, observing that Dr. Shareghi

"stated that [Mosier] is not capable of working an 8-hour day, 40 hours per week . . . ."  (Tr. 21.)

Ultimately, the ALJ reasoned with regard to Dr. Shareghi's opinion as follows:

The claimant's treating source, Dr. Shareghi, has stated several times in treatment
notes that she is disabled, but this is a conclusory statement not entitled to
controlling weight.  In a Medical Source Statement he opined that the claimant is
not capable of working an 8-hour day, 40 hours per week . . . .  The undersigned

17

finds that this statement is not adequately supported by objective evidence in Dr.
Shareghi's treatment notes or by other evidence of record.

(Tr. 22.)

The ALJ followed this explanation by revisiting the state agency doctors' findings and
those of the examining physician, Dr. Budzenski, both of which painted a sharply contrasting
picture of Mosier's capabilities.  The ALJ explained that the state agency consultants found that
Mosier could lift and carry fifty pounds occasionally and twenty-five pounds frequently, sit for
six hours, and stand or walk for six hours.  (Tr. 22.)  He further discussed their determination
that Mosier could not climb ladders, ropes, or scaffolds, and must avoid hazards, but that she
could occasionally perform other movements.  (Tr. 22.)  The ALJ then pointed to Dr.
Budzenski's finding that she could only lift ten pounds frequently, and "given [Mosier's] pain,"
ultimately ascribed "more weight" to Dr. Budzenski's opinion and adopted his finding.  (Tr. 22.)

Mosier launches three main attacks on the ALJ's analysis, the first of which is that he did
not properly consider that Dr. Shareghi was a specialist.  (Opening Br. 20.)  However, as noted
above, the ALJ did acknowledge that Dr. Shareghi is from the Milestone Pain and Rehabilitation
Center, and the Court will not accept Mosier's plea to merely re-weigh the evidence from the
medical source opinions of record.  *Clifford*, 227 F.3d at 869.  As stated *supra*, he provided
reasoning why Dr. Shareghi's conclusion that Mosier was incapable of working full time was not
entitled to controlling weight– it was conclusory, it conflicted with his own records in that he
never even assigned her any limitations, and it conflicted with the evidence of record,
specifically the opinions of the state agency physicians and the examining physician who
concluded that Mosier is capable of working with some limitations.  (Tr. 21, 22.)  *See* 20 C.F.R.
§ 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the

more weight we will give to that opinion.").

Mosier also maintains that Dr. Shareghi's opinion is supported by a "lengthy and detailed report, but the ALJ . . . failed to explain why some vaguely explained lack of effective medical evidence trumped this factor." (Opening Br. 20.) However, the ALJ *did indeed discuss* much of Dr. Shareghi's report, including his observations, diagnoses, and recommendations, indicating that he took it under consideration, and Mosier has not shown that in so doing he ignored a line of evidence. *Books*, 91 F.3d at 980 (explaining that "[i]f the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required") (internal quotation marks and citations omitted). An ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is able "to trace the path of the ALJ's reasoning." *Books*, 91 F.3d at 980.

Mosier also contends that the ALJ did not adequately evaluate Dr. Shareghi's treatment relationship with Mosier. (Opening Br. 20.) However, as discussed *supra*, the ALJ acknowledged that Dr. Shareghi both examined and treated Mosier "several" times, highlighting his various observations, diagnoses, and recommendations. (Tr. 21.) Furthermore, having considered such factors, the ALJ provided reasoning why he nevertheless chose to discount Dr. Shareghi's conclusion that Mosier is incapable of full time work – i.e., it was conclusory and at odds with the other medical evidence as discussed *supra*. (Tr. 22.) Thus, Mosier's argument that the ALJ ignored Dr. Shareghi's examining and treatment relationship is unavailing.

Regardless, the ALJ did not *completely* disregard Dr. Shareghi's opinion, but simply opted not to assign controlling weight to Dr. Shareghi's ultimate conclusion that Mosier is completely disabled. (Tr. 22.) The ALJ explained that the statement was conclusory (Tr. 22),

19

having highlighted that Dr. Shareghi never assigned Mosier specific limitations (Tr. 21), and he

contrasted it with the opinions of the state agency doctors and Dr. Budzenski's findings (Tr. 22).

In fact, the ALJ *credited* the finding that Mosier has much pain, opting to adopt Dr. Budzenski's

more conservative limitations "given [her] pain."  (Tr. 22.)

    Of course, "opinions from any medical source on issues reserved to the Commissioner

must never be ignored."  SSR 96-5p.  "In evaluating the opinions of medical sources on issues

reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. [§]

404.1527(d) . . . ."  SSR 96-5p.  Here, as we established, the ALJ neither ignored Dr. Shareghi's

opinion nor neglected to consider the § 404.1527(d) factors.  In fact, he does not appear to

completely discount Dr. Shareghi's opinion either – his reasoning simply seems to be an

acknowledgment of the principle that a claimant is not entitled to DIB simply because his

treating physician states that he is unable to work or disabled, *Clifford*, 227 F.3d at 870; the

determination of disability is reserved to the Commissioner.  *Id*.; *Diaz v. Chater*, 55 F.3d 300,

306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  In fact, "treating

source opinions on issues reserved to the Commissioner are never entitled to controlling weight

or special significance."  SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3).  "Giving controlling

weight to such opinions would, in effect, confer upon the treating source the authority to make

the determination or decision about whether an individual is under a disability, and thus would

be an abdication of the Commissioner's statutory responsibility to determine whether an

individual is disabled."  SSR 96-5p.

    Therefore, Dr. Shareghi's medical source statement "must not be equated with the

administrative finding known as the RFC assessment[,]" SSR 96-5p, and the determination of

Mosier's RFC is an issue reserved to the Commissioner.  20 C.F.R. § 404.1527(e).  Contrary to

Mosier's suggestions, then, the ALJ was correct not to give controlling weight to Dr. Shareghi's

conclusion that Mosier is disabled when rendering his RFC determination, particularly since, as

discussed *supra*, he apparently considered all the important evidence in making his

determination.  *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("[W]hile the treating

physician's opinion is important, it is not the final word on a claimant's disability.") (internal

quotation marks and citations omitted); *see generally Stephens v. Heckler*, 766 F.2d 284, 289

(7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client,

and so the treating physician may too quickly find disability.").

In sum, the ALJ sufficiently built an accurate and logical bridge between the evidence of

record and his conclusion with respect to Dr. Shareghi's opinion.  *Blakes ex rel. Wolfe v.

Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (collecting cases that state an ALJ is required to

build an accurate and logical bridge between the evidence and his conclusion so that a court may

afford the claimant a meaningful review).  Thus, Mosier's first argument fails to warrant a

remand of the Commissioner's decision.

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference.  *Powers*, 207 F.3d at 435.  If an ALJ's

determination is grounded in the record, and he articulates his analysis of the evidence "at least

at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*,

306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge from the

evidence to [the] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal

quotation and citation omitted), his determination will be upheld unless it is "patently wrong."

*Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)

(remanding an ALJ's credibility determination because the ALJ's decision was based on "serious

errors in reasoning rather than merely the demeanor of the witness . . . .").

> The ALJ provided the following credibility determination:

> The claimant testified that she has pain throughout her body, which is constantly
> at the 10/10 level. The undersigned finds her testimony to be less than fully
> credible and not supported by the objective medical evidence of record, including
> her treatment history, and her activities. She has greatly exaggerated her
> limitations and the level of pain that she experiences every day. Objective tests
> such as CT scans have not revealed any abnormalities. Treatment notes indicate
> that the claimant has reported improvement at times. In fact, she was scheduled
> for hospital admission to a Head Pain Treatment Unit in March 2002, but did not
> follow through because she reported that her headaches and overall pain were
> under very good control at the time. She was again scheduled for September
> 2002, but there is no evidence that she kept that appointment, either . . . . By her
> own testimony, she gets up each day and assists her daughter in getting ready for
> school and drives her to school. She also does some housework. The claimant
> alleged memory problems which are not substantiated by any significant medical
> treatment.

(Tr. 22.)

> In attacking the ALJ's credibility analysis, Mosier contends that "[t]he ALJ discredited

[Mosier's] testimony because of negative objective test results and because she greatly

exaggerated her limitations and level of pain that she experienced." (Opening Br. 20.) She

attempts to dash the ALJ's determination by arguing that he erred in relying on the results of the

CT scan in discrediting her (Opening Br. 21-22); that he selectively reviewed the evidence with

regard to his statements about her improvement at times (Opening Br. 22-23), her daily

activities, and her memory problems (Opening Br. 24); and that he failed to consider the impact

of her mental condition (Opening Br. 24-25). Mosier's arguments, however, miss the mark.

Mosier seems to interpret the ALJ's credibility determination as one that wholly discredits her testimony.  To the contrary, the ALJ focuses on Mosier's specific testimony "that she has pain throughout her body, which is constantly at the 10/10 level."[8]  (Tr. 22.)  *That particular testimony*, the ALJ explains, he finds *"less than fully credible* and not supported by the objective medical evidence of record, including her treatment history, and her activities[,]" providing no less than four reasons for this conclusion.  (Tr. 22 (emphasis added).)  The reasoning that he provides, then, is in essence that although she testified that practically her entire body is constantly in a state of utmost pain, objective tests reveal no abnormalities; her pain and symptoms have in fact improved at times; she manages getting her daughter ready for school, driving her there, and doing housework; and her memory problems required no substantial medical treatment.  In providing these reasons, the ALJ's "determination is grounded

---

[8]Mosier testified that she experiences pain on her scalp, back, hips, shoulders, upper chest, arms (especially the left), legs, feet, neck, but not her face; and that there are particular spots where her skin is more painfully sensitive.  (Tr. 470-71.)  The testimony then proceeded as follows:

Q. On a scale of 1 to 10 with 1 being low or no pain and 10 being so bad that you actually go to the hospital, what's the worst the pain gets in your neck?

A. Well, I don't go to the hospital anymore because I've got pain meds that kind of, if I keep taking them they dull it a little.

Q. Okay.

A. You know.  And, and it is extremely exhausting being in pain 24 hours a day.  It keeps me from sleeping, it keeps me from doing much of anything.

Q. Okay.

A. Lifting.  So, I would say that it's always, always at least an 8 and usually it's a 9.

Q. Okay.  And what's the, the, when you use the pain meds and the other things what, what's the lowest it goes down to.

A. That's when it maybe gets to an 8 from a 10.

Q. Okay.  Now, in other areas that you described is the pain as severe there as far as the intensity or is that different?

A. That's always a 10.  Those places are always a 10.

Q. I'm sorry?  The, other places?

A. Yeah.  And it gets really hurting me, it hurts me to sit, it hurts me to stand, it hurts me to walk.

Q. Okay.  Well, we're, now, we're talking about 10 as going to the hospital and you're not there anymore.

A. Yeah, well, like I said, I, you know, I haven't gone to the hospital for a long time because Dr. [Shareghi] is trying to find a way to keep me from having to do that.

(Tr. 471-72.)

in the record, and he articulate[d] his analysis of the evidence 'at least at a minimum level.'"

*Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988). *See also Powers v. Apfel*, 207 F.3d 431, 435

(7th Cir. 2000) (upholding an ALJ's credibility determination where the "ALJ found that [the

claimant] did indeed suffer some pain from her [fibromyalgia] . . . but not to the completely

debilitating extent that [she] alleged"); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)

(observing that in most cases fibromyalgia is not disabling).

Mosier argues that in finding that she experienced improvement at times, the ALJ

overlooked evidence showing that Mosier reported increases in pain or that her condition

fluctuated.  (Opening Br. 22-23.)  To begin, the ALJ did not ignore such evidence – in fact, the

ALJ did discuss the bulk of the evidence that Mosier contends he overlooked.  For example, the

ALJ *expressly noted* Dr. Prestegaard's report that Mosier indicated increased pain and mild

headaches three to five days per week and severe headaches two to three times per week.  (Tr.

21.)  He also acknowledged that Dr. Prestegaard found tender points indicative of fibromyalgia

and determined that stress exacerbated the headaches and caused a flare-up of fibromyalgia.  (Tr.

21.)  Furthermore, contrary to Mosier's assertions, the ALJ also considered Mosier's complaints

of pain to Dr. Shareghi as well as his observations, including that she had the trigger points for

fibromyalgia and allodynia and hyperpathia of the bilateral upper and lower extremities, that she

could not wear a bra because the discomfort it causes her skin, that she sometimes has sharp

burning pain in her extremities, that he diagnosed RSD, and that he recommended a morphine

pump.  (Tr. 21.)  Therefore, the ALJ did not ignore evidence of significant pain; he simply noted

that she did in fact "at times" report improvement.  (Tr. 22.)

Furthermore, and more to the point, there is nothing "patently wrong," *see Berger v.*

*Astrue*, 516 F.3d 539, 546 (7th Cir. 2008), with the ALJ's statement that Mosier reported improvement at times.  Indeed, the ALJ follows up this reason with two specific examples: that she was scheduled for hospital admission to the Head Pain Treatment Unit in March 2002 but did not go because her pain was under control, and that even though she was rescheduled to go in September, the record reflects that she did not.  (Tr. 22.)  Thus, Mosier's testimony that nearly her entire body is in a constant state of extreme pain (pain so severe that she should go to the hospital) is conceivably undermined by the evidence that she in fact had reported improved symptoms at times throughout her treatment.  *See Berger*, 516 F.3d at 546 (stating that "an ALJ's credibility assessment will stand as long as [there is] some support in the record") (internal quotation marks and citation omitted).

Mosier also accuses the ALJ of selectively reviewing the evidence as to his statement that she "gets up each day and assists her daughter in getting ready for school and drives her to school" (Tr. 22), arguing that the ALJ ignored her testimony about the rest of the day, in which she spent a significant time resting due to fatigue, and that her husband helps out with taking care of their daughter.  (Opening Br. 24.)  However, the ALJ is not required to consider every piece of evidence, as long as his path of reasoning can be traced.  *Scheck*, 357 F.3d at 700; *Clifford*, 227 F.3d at 872.  Here, the ALJ's reasoning is viewed in reference to Mosier's testimony of "level ten" pain throughout her body.  In that light, even the simple tasks of getting her child off to school would seem contradictory to her claim of pain throughout her body so intense she should go to the hospital, and thus the ALJ's reasoning does in fact "build an accurate and logical bridge from the evidence to the conclusion."  *Berger*, 516 F.3d at 544.  The ALJ also added that Mosier does some housework, further illustrating this point.  (Tr. 22.)

Thus, the ALJ did not completely discredit Mosier's statements of fatigue and exhaustion – he merely opined that they are not to the extreme degree she testifies based on her *other* more strenuous daily activities.  Furthermore, that the ALJ considered Mosier's daily activities is entirely proper.  *See* 20 C.F.R. § 404.1529(c)(3) (*specifically instructing* an ALJ to consider a claimant's daily activities when evaluating her subjective complaints); *see generally Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (finding that the ALJ properly considered the claimant's daily activities, among other factors, when assessing credibility); *see, e.g., Jones v. Barnhart*, No. 04 C 3532, 2005 WL 66072, at *10 (N.D. Ill. Jan. 10, 2005) (considering claimant's ability to care for his two children, perform household chores, drive a car, and maintain his personal grooming as probative of the credibility of his testimony of debilitating limitations).

Mosier next asserts that the ALJ selectively reviewed the evidence with regard to his statement that Mosier "alleged memory problems which are not substantiated by any significant medical treatment."  (Tr. 22; Opening Br. 24.)  Mosier maintains that the ALJ overlooked evidence that Mosier's perceived memory problem could have been attributed to her exhaustion and fatigue; specifically, Dr. Utz's observation that it was difficult to determine whether Mosier was struggling with exhaustion or had concentration problems and his belief that it was her exhaustion affecting her so.  (Opening Br. 24.)

It is Mosier, however, who is mistaken, for in discussing Dr. Utz's opinion, the ALJ acknowledged not only Dr. Utz's statement that "her concentration is not as poor as she thinks it is[,]" but he also *explicitly considered* that Dr. Utz "felt that she was emotionally exhausted in reaction to her multiple medications and chronic pain."  (Tr. 19-20.)  Furthermore, regardless of

the cause of her problems with memory and concentration, Dr. Utz nevertheless concluded that

"her concentration is not as poor as she thinks it is, *or presents it*, given her performance on

serial 7's, etc.[,]" (Tr. 247 (emphasis added)), which the ALJ specifically noted (Tr. 19).  This

evidence supports his conclusion that Mosier's memory problems are not substantiated by

significant medical treatment, and the ALJ's credibility assessment must stand "'as long as [there

is] some support in the record,'" *Berger*, 516 F.3d at 546 (quoting *Schmidt v. Astrue*, 496 F.3d

833, 842 (7th Cir. 2007)).  Therefore, Mosier's argument that the ALJ ill-considered the

evidence of her memory problems is unconvincing.

Mosier further argues that the ALJ failed to consider her psychological problems, which

the ALJ considered non-severe, in combination with her physical impairments when determining

the credibility of her complaints. (Opening Br. 24-25.)  Specifically, Mosier contends that the

ALJ failed "to consider evidence of the impact of her mental condition on her pain and other

symptoms, her medications, and her sleep problems."  (Opening Br. 24.)  Contrary to Mosier's

assertion, "[n]o evidence in the record suggests that the ALJ failed to consider the combined

effects of [Mosier's] impairments." *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at *7

(N.D. Ill. March 12, 1999).  Rather, the ALJ specifically explained that the RFC by definition

considers "the effects of physical and/or mental limitations that affect the ability to perform

work-related tasks." (Tr. 21 (citations omitted).)

Furthermore, the ALJ thoroughly addressed Mosier's mental status in his opinion

(penning at least two paragraphs on it) (*see* Tr. 19-20), noting that Mosier received treatment

from Dr. Booth for depression and anxiety, that she visited psychologists at Michigan Head-Pain

four times and Northeastern Center once but did not follow through with recommended

27

treatment plans, and that she underwent a consultative mental status exam with Dr. Utz.  (Tr. 19.)  The ALJ *expressly considered* Dr. Utz's conclusion that Mosier's "depression is related to her physical distress," and that he found no evidence of major depression but diagnosed adjustment reaction with mixed emotional features including depression and anxiety.  (Tr. 19-20.)  Contrary to Mosier's assertion, the ALJ also *explicitly noted* that Dr. Prestegaard found that "stress had caused an exacerbation of the headaches and a flare-up of fibromyalgia" (Tr. 21), and that Dr. Budzenski "observed that [Mosier] is on a number of medications that could be interacting adversely, or causing side effects" and diagnosed her with polypharmacy (Tr. 21).[9]  Thus, the ALJ certainly did not turn a blind eye to Mosier's mental condition and subsequently did not err when assessing it.  *Compare Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the [obesity] issue with the aggregate effect of her other impairments."), *with Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) ("[T]here is no indication that in assessing [the claimant's] joint problems the administrative law judge gave insufficient weight to the effect on them of [the claimant's] obesity, which is anyway not extreme.").  Therefore, this attack on the ALJ's credibility determination fails to warrant a remand.[10]

---

[9]Mosier points to evidence that the ALJ did not discuss, including Dr. Bialik's opinion that Mosier may have flashbacks of her child abuse, and the Northeastern Center's specific diagnosis of somatoform disorder. (Opening Br. 25.)  However, an ALJ "need not provide a complete written evaluation of *every piece* of testimony and evidence[.]"  *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) (emphasis added).  Here, while the ALJ may not have pointed to that specific evidence, he did discuss other evidence relating to her mental status and its impact on her pain, as noted *supra*.  Thus, the ALJ "sufficiently articulate[d] his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning[,]" which is all that is required.  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (internal quotation marks and citation omitted).

[10]Mosier also took issue with the ALJ's reasoning that "[o]bjective tests such as CT scans have not revealed any abnormalities."  (Tr. 22; Opening Br. 21-22.)  Mosier maintains that a negative CT scan "is not objective evidence that is diagnostic of her three main impairments of migraine headaches, fibromyalgia, and RSD" (Opening Br. 21-22) and therefore the ALJ failed to properly articulate this basis for discrediting Mosier.  Indeed, this

In sum, the ALJ did not fully discredit Mosier; he merely found her statement regarding the intensity of her pain not fully credible, providing reasons to support that notion.  "This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding[,]" *Skarbek*, 390 F.3d at 505 (citations omitted), as the ALJ has done here.  Ultimately, Mosier's arguments amount to mere nitpicking at the ALJ's decision.  *See Rice*, 384 F. 3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it") (internal quotation marks and citations omitted).  Accordingly, the credibility determination will not be disturbed.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Mosier.

SO ORDERED.

Enter for this 7th day of April, 2008.

S/Roger B. Cosbey               
Roger B. Cosbey,
United States Magistrate Judge

---

reasoning is the ALJ's least persuasive – while the CT scan relates to Mosier's headaches, it is not clear how a negative scan would necessarily discredit her other complaints or which other objective tests he believed would. Nevertheless, the ALJ's reasoning is not "patently wrong" with respect to the results of Mosier's CT scan and it is easily traceable to Mosier's complaints of headaches.  Thus, given the other substantial evidence in support of the ALJ's credibility determination and the special deference assigned to an ALJ's credibility determination, this reasoning fails to warrant a remand.  *See Berger*, 516 F.3d at 546 (upholding an ALJ's credibility determination even though some of the analysis was "a bit harsh[,]" because "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record'") (citation omitted).